# Exhibit 1

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF
HINDS COUNTY, MISSISSIPPI

CITY OF JACKSON,

     Plaintiff,

V.

SIEMENS INDUSTRY, INC., SIEMENS
CORPORATION, SIEMENS AG, CHRIS
MCNEIL, U.S. CONSOLIDATED, INC.,
U.S. CONSOLIDATED GROUP LLC,
M.A.C. & ASSOCIATES, LLC, IVISION IT
CONSULTANTS LLC, GARRETT
ENTERPRISES CONSOLIDATED, INC.
and JOHN DOES 1 – 10

     Defendants.

CAUSE NO. _____19-375_____

**F I L E D**

JUN 11 2019

ZACK WALLACE, CIRCUIT CLERK

BY _____ D.C.

## PLAINTIFF'S ORIGINAL COMPLAINT
## (JURY TRIAL DEMANDED)

Plaintiff, the City of Jackson, Mississippi (the "City" or "Plaintiff"), files this Original

Petition against Defendants, Siemens Industry, Inc., Siemens Corporation, Siemens AG, Chris

McNeil (collectively, "Siemens"), U.S. Consolidated, Inc., U.S. Consolidated Group LLC

(collectively, "U.S. Consolidated"), M.A.C. & Associates, LLC ("M.A.C."), Ivision IT

Consultants LLC ("Ivision"), Garrett Enterprises Consolidated, Inc. ("Garrett"), and John Does 1

– 10 (collectively, the "Defendants"), and hereby pleads as follows:

### I. PARTIES

1.    Plaintiff, the City of Jackson, is a municipal corporation organized and existing

under the laws of the State of Mississippi. The City of Jackson is a mid-sized city with a

population of approximately 165,000 residents. The Jackson Area Water and Wastewater system

serves residents and citizens within Hinds County, Mississippi. The City is governed by the

Mayor and City Council. The Mayor is elected by the at-large vote of the residents and citizens of the City. There are seven members of the City Council, each elected to represent the citizens and residents of one of the City's seven Wards. This lawsuit is filed by authority of the Mayor of the City of Jackson and with approval of the City Council as the elected representatives of the citizens and residents of the City.

2.     Siemens Industry, Inc. is a Delaware corporation doing business in the State of Mississippi. Siemens Industry, Inc. may be served through its registered agent, CT Corporation System, at 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

3.     Siemens Corporation is a Delaware corporation doing business in the State of Mississippi. Siemens Corporation may be served through its registered agent, CT Corporation System, at 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

4.     Siemens AG is a German corporation that does business in the State of Mississippi through its subsidiaries, including Siemens Industry, Inc. and Siemens Corporation, and under the umbrella of "Siemens" and "One Siemens." Siemens AG may be served through Joe Kaeser, its President and Chief Executive Officer, at Wittelsbacherplatz 2, 80333 Munich, Germany, or wherever he may be found.

5.     Chris McNeil is an individual who, on information and belief, resides and works in Mississippi. McNeil is a former employee of Siemens and is being sued in his individual capacity and in his capacity as an agent of Siemens. McNeil may be served at 980 North Bierdeman Road, Pearl, Mississippi 39208, or wherever he may be found.

6.     U.S. Consolidated, Inc. is a Mississippi corporation with its principal office located at 4785 I-55 North, Suite 102, Jackson, Mississippi 39206. U.S. Consolidated, Inc. may

be served through its registered agent, Tom Wallace, at 939 Royal Oak Dr., Jackson, Mississippi 39209, or wherever Mr. Wallace may be found.

7.      U.S. Consolidated Group LLC is a Mississippi limited liability company doing business in the State of Mississippi. U.S. Consolidated Group LLC may be served through its registered agent, Tommy Wallace, at 4785 I-55 North, Suite 102, Jackson, Mississippi 39206, or wherever Mr. Wallace may be found.

8.      M.A.C. & Associates, LLC is a Mississippi limited liability company doing business in the State of Mississippi, with its principal office located at 125 S. Congress St., Suite 1300, Jackson, Mississippi 39201. M.A.C. & Associates, LLC may be served through its registered agent, Marcus L. Wallace, at 125 S. Congress St., Suite 1300, Jackson, Mississippi 39201, or wherever Mr. Wallace may be found.

9.      Ivision IT Consultants LLC is a Mississippi limited liability company doing business in the State of Mississippi. Ivision IT Consultants LLC may be served through its registered agent, James Covington, at 1061 Whitsett Walk, Jackson, Mississippi 39206, or wherever Mr. Covington may be found.

10.     Garrett Enterprises Consolidated, Inc. is a Mississippi corporation with its principal office located at 2659 Livingston Road, Jackson, Mississippi 39213.   Garrett Enterprises Consolidated, Inc. may be served through its registered agent, Leland Socrates Garrett, at 2659 Livingston Road, Jackson, Mississippi 39213, or wherever Mr. Garrett may be found.

11.     Defendants John Does 1 – 10 are persons or entities who may be liable for all or part of the claims or damages set forth in this Complaint, but whose involvement or identity is

unknown at this time. These defendants include, without limitation, individuals or entities who received improper payments or benefits in connection with the project at issue in this lawsuit.

## II. JURISDICTION AND VENUE

12.      This Court has subject matter and personal jurisdiction over the Defendants under Mississippi Code § 9-7-81. The Defendants reside in Mississippi and/or committed the acts, omissions, and torts described in this Complaint in the State of Mississippi. Defendants also have systematic and continuous contacts with the State of Mississippi.

13.      Under Mississippi Code § 11-11-3, venue is proper in the Circuit Court of Hinds County, Mississippi because the events that caused the injuries at issue occurred in Hinds County, Mississippi.

## III. CONDITIONS PRECEDENT

14.      All conditions precedent necessary to maintain this action have been performed or have occurred.

## IV. CASE OVERVIEW

15.      This case involves a massive fraud orchestrated by Siemens under the guise of an energy performance contract promising $120 million in guaranteed savings for the City. Siemens was paid $90 million to install a new automated water meter and billing system and to make repairs to the City's water treatment plants and sewer lines. Siemens committed fraud with respect to who was performing the work on the project, what the system would do, and what savings the system would generate, among other things. Far from delivering on its promise of $120 million in guaranteed savings, Siemens caused more than $225 million in losses to the City.

16.      To induce the City to hire Siemens for the $90 million project, Siemens guaranteed that increased revenue and savings from the water meter upgrades would pay for the

4

cost of the project.  Siemens assured the City that the new system would be so accurate in measuring the water consumed by the City's customers that the system would pay for itself through increased revenue collections and a decrease in the number of City employees needed to manage the automated system.  In its pitch to the City, Siemens repeatedly invoked the guaranteed structure of an energy performance contract.

17.    Siemens failed the citizens of Jackson in its promises to perform and in its obligations of honesty and fair dealing.  When it came time to execute an agreement, Siemens effectuated a "bait-and-switch" that fell short of a true performance contract.  Despite promising to structure an agreement to comply with the requirements of an energy performance contract regulated by the State of Mississippi, Siemens created a deal structure with illusory savings and no real performance assurances at all.  The substantial majority of the purported "savings" under the contract are phony, assumed amounts that are not measured against actual savings or revenue realized by the City.  Siemens represented that it would structure the agreement to comply with energy performance contracting requirements, but it intentionally omitted any true performance guarantees or energy savings in the contract itself.  The City thus took on all of the risk of the project while Siemens was paid $90 million regardless of its delivery of actual savings and revenue.

18.    As a further inducement for the City to enter into a contract with Siemens, Siemens also misrepresented its commitment to hire qualified, minority-owned subcontractors under an Equal Business Opportunity (EBO) plan.  In an effort to provide opportunities for historically-underutilized businesses, the City encourages contractors like Siemens to consider qualified minority-owned businesses when selecting subcontractors to perform work on public works projects.  As part of its pitch to secure a contract with the City, Siemens represented that it

would utilize minority-owned businesses to carry out 58% (more than $52 million) of the $90 million project cost. However, Siemens never intended to hire qualified EBO subcontractors to actually perform the work. Instead, Siemens conspired with its co-defendants and used a pass-through scheme in which it hired sham subcontractors and middlemen to inflate its EBO numbers and deceive the City's residents. Focused only on generating a multi-million dollar project for itself, Siemens drove up the cost of the project by using unqualified pass-through entities selected on the basis of their political connections and influence rather than their qualifications, thereby depriving qualified and competent EBO contractors the opportunity to perform the work in accordance with the law and the representations made by Siemens. Siemens and its co-defendants manipulated the EBO plan requirements and made millions of dollars to the detriment of the citizens of Jackson.

19.     Siemens not only defrauded the City and its residents through the contracting process, but Siemens also failed to provide a water meter system that works. The $90 million project has been plagued by technical problems. More than half of the 60,000 water meters were installed incorrectly, causing delays in the project and chronic, ongoing problems with accurately measuring and billing for water usage by the City's customers. The billing system was not set up appropriately to address the thousands of faulty meter readings, which resulted in accounts becoming "stranded" in the system. To this day, the metering system has repeatedly generated grossly inaccurate bills and, in some instances, failed to generate bills at all. It is estimated that at least 10,000 of the 60,000 meters installed by Siemens are not functioning correctly. This has resulted in the City's inability to collect revenue from water use, while the City's residents and businesses have lost all confidence in the defective system installed by Siemens.

20.     Instead of delivering more timely and accurate water bills for customers and additional revenue for the City, the $90 million water system has been a financial disaster. The City is losing $2 million in revenue each month and has lost more than $20 million in revenue over the last year alone.   The new meter and billing system has failed to cover even the operations and maintenance expense incurred by the City to manage and correct the flawed system. All the while, the City is burdened with making annual debt payments of $7 million to pay off its investment in a water system that does not work, and the City is unable to fund other necessary projects due to a downgrade in its credit rating as a result of the Siemens project.

21.     Given the fraud and technical failures of the Siemens project, the City has been forced to bring this lawsuit to hold Siemens and its co-defendants accountable for their promises to the citizens of Jackson.  The City seeks to recover more than $150 million for the City's costs of funding the fraudulent deal, which includes the $90 million paid to Siemens and the City's debt service costs for financing the project. The City also seeks to recover more than $75 million for lost revenue and for damage to the City's creditworthiness and reputation, which has impacted the City's ability to obtain financing for other necessary public works projects. Finally, the City seeks to recover several million dollars for the estimated cost to repair the malfunctioning water meter system and to pay for ongoing operations and maintenance costs for the system.

## V. FACTUAL BACKGROUND

### A.     Siemens Makes False Promises to Induce the City to Approve the Project.

22.     The City's path to the ill-fated project with Siemens started several years ago.  In August 2011, the City, through the administration of former Mayor Harvey Johnson, issued a Request for Qualifications for an Energy Performance Contract.  Siemens issued a response to the City's Request for Qualifications in or around October 2011.

23.     After receiving Siemens's response, the City and Siemens engaged in discussions regarding the City's water meter system and the possibility of improvements to the system under an energy performance contract.  During those discussions, Siemens representatives, including Chris McNeil, represented that the City would generate additional revenue from water usage and would realize operational savings if it upgraded its water meter system.  Siemens and McNeil assured the City that the additional revenue and savings would pay for the cost of the project and would result in incremental revenue for water usage not captured by the City's current meters.

24.     In May 2012, Siemens conducted an audit of the City's water system.  As part of the audit, Siemens prepared a technical analysis of the City's water meter system.  The analysis claimed that the City's meters were only 86% to 94% accurate, and the meter accuracy would decrease to 79% to 87% over a fifteen-year period.  Siemens, through representatives that included Chris McNeil, represented that new water meters installed by Siemens, by comparison, would have a 98.5% accuracy rate.  Siemens represented that its more accurate meters would result in increased revenue for the City without the need to raise rates charged to the citizens of Jackson.  Siemens and McNeil further represented that the City would benefit from operational and maintenance savings associated with updated meters that could be read remotely, which would eliminate the need for City personnel to read individual meters and perform repairs to the old system.

25.     Siemens guaranteed that the City would realize more than $120 million in increased revenue and savings as a result of the water meter upgrades.  Siemens representatives, including McNeil, again represented that the guaranteed savings from the water meter upgrades would pay for the cost of the project and the City's cost of financing the work.  To convince the City to issue a notice to proceed with the project, Siemens representative Chris McNeil assured .

8

the City Council in July 2013 that the City would immediately begin to realize savings and increased revenue as soon as the Siemens project began, which would allow the City to pay for its debt service during the construction period and over the course of the City's loan repayment. The City relied on Siemens's and McNeil's promises of immediate, guaranteed savings in authorizing commencement of the project.

26.     To induce the City to enter into a contract with Siemens, Siemens representatives, including McNeil, also represented to the City that more than 50% of the total project cost would comply with the City's EBO plan by utilizing minority-owned businesses in performing aspects of the project.  In September 2012, Siemens submitted an application to the City's EBO Office representing that 58% of the project cost would be subcontracted to minority-owned businesses. Siemens acknowledged that the minority-owned businesses involved in the project would, per the requirements of the City's EBO plan, perform a "commercially useful function" by being responsible for a distinct element of the work and by actually performing, managing, and supervising the work involved.  Siemens also represented to the City that Siemens would mentor and train the minority-owned businesses involved in the project.

27.     In October 2012, relying on Siemens's and McNeil's promises of increased revenue and savings and involvement of minority-owned businesses, the City Council approved entering into a contract with Siemens to upgrade the City's water system.  The City later discovered, however, that Siemens manipulated the contracting process and provided illusory guarantees to the City in order to secure the contract.

**B.**     **Siemens Imposes a Contract Structure Burdened by $90 Million in Upfront Costs and Illusory Guarantees.**

28.     Siemens representatives, including McNeil, pitched the Siemens project to the City as an energy performance contract.  Energy performance contracts are subject to public

contracting requirements and are regulated by the State of Mississippi through the Mississippi Development Authority ("MDA"). Despite presenting its project as an energy performance contract, however, Siemens created a contract structure that fails to deliver the guaranteed energy performance and savings promised by Siemens and required by law for such regulated contracts.

29.     The City and Siemens entered into what was called the Performance Contracting Agreement (the "Agreement"), dated January 30, 2013, but signed by former Mayor Harvey Johnson on December 28, 2012. The Agreement was amended four times to address specific issues. A copy of the Agreement, with Amendments 1, 2, 3, and 4, is attached as Exhibit A to this Complaint.

30.     The Agreement required Siemens to "install an Automatic Metering System to provide hourly reads." *See* Amendment No. 4 at § 1.2.1. The required components of the automatic metering system included 60,000 water meters with remote transmitters, 4,700 backup water meters for inventory, 60 data hub collectors, and 900 network repeaters. *See id*. In addition, the Agreement called for Siemens to implement a new billing and payment system, referred to as the Customer Care & Billing (CC&B) System, as part of the meter upgrades. Siemens was obligated to develop and install the new billing software module and server, transfer billing account data from the existing billing system to the CC&B System, and provide training and technical support for the new automatic metering and billing system. *See id*. Among other specific obligations, Siemens agreed to "provide training and administrative support prior to Substantial Completion of the Project to *ensure a functional system*." *See id*. (emphasis added).

31.     Despite its repeated representations regarding a performance contract with guaranteed revenue and savings, Siemens created a deal structure that required the City to pay

$90 million in upfront installation costs and another $4.5 million for Siemens to measure what were essentially illusory performance guarantees. The "Performance Guarantee" from Siemens states that "the increase in billable usage over the Baseline … , through more accurate measurement, will be equal to or exceed the total Project Cost" of $90 million. *See* Agreement at Exhibit C, § 1.3. Table 1.2 of the Agreement identifies $122 million in guaranteed savings, broken down by billable usage increase, operational savings, and deferred maintenance savings:

| Table 1.2 – Total Guaranteed Savings (Cost) | | | | | |
|---|---|---|---|---|---|
| Performance Period | Small Meter Billable Usage Increase $ | Large Meter Billable Usage Increase $ | Operational Savings $ | Deferred Maintenance Savings $ | Total Savings $ |
| Annual Period 0 | $2,309,957 | $501,802 | $503,750 | - | $3,315,509 |
| Annual Period 1 | $2,529,702 | $1,003,604 | $2,015,200 | $1,654,389 | $7,202,895 |
| Annual Period 2 | $2,657,333 | $1,003,604 | $2,075,656 | $1,654,389 | $7,390,983 |
| Annual Period 3 | $2,784,965 | $1,003,604 | $2,137,926 | $1,654,389 | $7,580,884 |
| Annual Period 4 | $2,784,965 | $1,003,604 | $2,202,063 | $1,654,389 | $7,645,021 |
| Annual Period 5 | $2,784,965 | $1,003,604 | $2,268,125 | $1,654,389 | $7,711,083 |
| Annual Period 6 | $2,784,965 | $1,003,604 | $2,336,169 | $1,654,389 | $7,779,127 |
| Annual Period 7 | $2,784,965 | $1,003,604 | $2,406,254 | $1,654,389 | $7,849,212 |
| Annual Period 8 | $2,784,965 | $1,003,604 | $2,478,442 | $1,654,389 | $7,921,400 |
| Annual Period 9 | $2,784,965 | $1,003,604 | $2,552,795 | $1,654,389 | $7,995,753 |
| Annual Period 10 | $2,784,965 | $1,003,604 | $2,629,379 | $1,654,389 | $8,072,337 |
| Annual Period 11 | $2,784,965 | $1,003,604 | $2,708,260 | $1,654,389 | $8,151,218 |
| Annual Period 12 | $2,784,965 | $1,003,604 | $2,789,508 | $1,654,389 | $8,232,466 |
| Annual Period 13 | $2,784,965 | $1,003,604 | $2,873,193 | $1,654,389 | $8,316,151 |
| Annual Period 14 | $2,784,965 | $1,003,604 | $2,959,389 | $1,654,389 | $8,402,347 |
| Annual Period 15 | $2,784,965 | $1,003,604 | $3,048,171 | $1,654,389 | $8,491,129 |
| TOTALS | $43,701,532 | $15,555,862 | $37,984,280 | $24,815,841 | $122,057,515 |

32.     This performance guarantee structure imposed by Siemens contains purported "savings" that are illusory and not based on reality. The alleged savings from large meter usage increases, operational reductions, and deferred maintenance are not based on actual savings or revenue, but rather on amounts that are assumed to occur over the 15-year period covered by the contract. As a result, only the small meter revenue increase is subject to an actual measurement of performance for each annual period. And even under that component, Siemens measures its

11

own performance and does not compare the alleged usage increases to actual revenue collected by the City. Siemens thus created a performance contract structure with no real performance guarantees, and with 65% (around $80 million) of the $122 million in purported savings based on amounts that will never be measured to determine if the savings actually occurred.

33.    Compounding the illusory nature of Siemens's performance guarantees, Siemens is charging the City another $4.5 million to measure its own yearly performance. If the City fails to pay for the ongoing Performance Assurance Program, Siemens will not guarantee the purported savings promised under the Agreement. Siemens thus is charging the City $4.5 million for a self-evaluation of performance metrics that do not reflect the City's actual collected revenue and realized savings. Knowing the City lacked the technical expertise to evaluate fully Siemens's proposal, Siemens was able to effectuate a "bait-and-switch" that fell short of a true energy performance contract with guaranteed savings and revenue that would pay for the cost of the project.

## C.    Siemens Manipulates EBO Plan Requirements by Using a Fraudulent Pass-Through Scheme.

34.    On top of Siemens's illusory guarantees, Siemens's "bait-and-switch" scheme was facilitated by its manipulation of EBO plan requirements. To induce the City to enter into the Agreement, Siemens representatives, including McNeil, represented that minority-owned businesses would be utilized for 58% of the $90 million project cost. Yet Siemens and McNeil never intended to live up to that promise. Instead, Siemens and McNeil conspired with the other Defendants and concocted an EBO pass-through scheme in which Siemens utilized sham subcontractors to obtain approval of the Agreement.

35.    Siemens submitted a plan to use several minority-owned businesses as subcontractors for the project to satisfy its 58% commitment. As part of the EBO plan, Siemens

purported to engage U.S. Consolidated, Inc. and/or U.S. Consolidated Group LLC ("U.S. Consolidated"), a company owned and managed by former Mississippi state politician and lobbyist Tom Wallace, as a subcontractor responsible for supplying the water meters for the project. Siemens representatives, including McNeil, represented to the City that Siemens would pay U.S. Consolidated approximately $19 million for water meter supply and logistics. At the conclusion of the project, Siemens claimed that it ended up paying U.S. Consolidated approximately $19.5 million for its work on the water project.

36.    However, in reality, Siemens and McNeil brought in U.S. Consolidated as a pass-through entity involved in the supply of water meters on paper only. Siemens carried out its scheme by having U.S. Consolidated buy the water meters from the manufacturer, Mueller Systems, and then sell the meters to Siemens at a marked-up price for installation by yet another subcontractor. Siemens thus conspired with U.S. Consolidated, a minority-owned business, to use U.S. Consolidated as the water meter middleman to funnel the meters to Siemens as part of a fraudulent EBO scheme, all at an increased cost to the City. Siemens simply used Tom Wallace's company as a pass-through entity to inflate the EBO participation percentage for the project. For its part, U.S. Consolidated received nearly $20 million for doing nothing more than serving as a middleman for water meters that were manufactured and installed by other companies.

37.    Siemens and McNeil used other sham contractors in the EBO pass-through scheme. Siemens and McNeil represented to the City that M.A.C. & Associates, LLC ("M.A.C."), a minority-owned business owned and managed by Marcus Wallace, would be paid approximately $19 million as a subcontractor responsible for water plant and sewer line repairs and installation of the new water meters. In reality, Hemphill Construction, Inc. performed most

of the water plant and sewer line repairs, either through a separate subcontract with Siemens or through a second-tier subcontract with M.A.C.  At the direction of Siemens, Pedal Valve, Inc. also performed a substantial portion of the water meter installation work through a subcontract with Siemens or a second-tier subcontract with M.A.C.  Because M.A.C. was not qualified to perform the work assigned to it on paper as part of Siemens's EBO scheme, Hemphill and Pedal Valve actually performed the work, which increased the costs to the City.  Siemens and McNeil falsely claimed that M.A.C. was providing a commercially useful function as a qualified EBO contractor even though other contractors actually performed the work.  M.A.C. conspired with Siemens and agreed to serve as a pass-through entity in return for receiving $19 million.

38.    Similarly, Siemens and McNeil represented that Ivision IT Consultants LLC ("Ivision"), a minority-owned business owned and managed by James Covington, was paid approximately $11 million as a subcontractor responsible for implementing the new CC&B billing system.  However, another company ended up performing most of that work, and it is unclear what role, if any, Covington's company actually played in performing or managing the implementation of the billing system.  Ivision was paid $11 million for simply serving as a pass-through entity for Siemens's EBO scheme.

39.    Finally, Siemens and McNeil represented to the City that Garrett Enterprises Consolidated, Inc. ("Garrett"), a minority-owned business owned and operated by Socrates Garrett, was paid $4.6 million to perform construction management and quality control services.  However, it is unclear what services, if any, Garrett actually performed and how those services provided any commercially useful function for the project and benefit to the citizens of Jackson.  Like the other sham subcontractors, Garrett received millions of dollars to serve as a pass-through entity under Siemens's fraudulent EBO plan.

40.    The City approved the Siemens project based on Siemens's and McNeil's fraudulent representations regarding Siemens's EBO plan commitments.  Instead of abiding by its promise to hire minority-owned businesses to perform 58% of the $90 million contract, Siemens used unqualified, sham subcontractors based on their political connections and influence to carry out a pass-through scheme that ultimately cost the City millions of dollars in inflated costs for an already overpriced water system.  Siemens's selection of unqualified EBO subcontractors resulted in shoddy work that contributed to problems with the current water system and deprived other qualified EBO businesses the opportunity to perform the work.

**D.    Siemens Provides a Flawed Metering and Billing System that Fails to Deliver Increased Revenue and Savings.**

41.    In addition to the Agreement being tainted by Siemens's fraud, the Siemens project was plagued by technical problems from the start.  Among other issues, it is estimated that more than half of the 60,000 water meters were installed incorrectly or did not satisfy the required specifications, causing delays in the project and problems with accurately measuring and billing for water usage by the City's customers.  The entire project was delayed in early 2015 when the City discovered that Siemens had installed meters that read in gallons instead of the appropriate cubic-feet reading.  Absent the City catching Siemens's mistake, the incorrect meters would have resulted in drastically-higher and inaccurate bills to the City's customers.

42.    Shortly after the new billing system went live in 2015, the City began to accumulate a backlog of thousands of "stranded bills," which continues to grow even as the City works to clear those bills.  The billing system has caused many customers to receive inexplicably high bills that do not reflect their actual water usage.  In other instances, customers may receive no bill at all for significant periods of time, only to eventually receive an unusually high bill based on months of purported water usage.  These issues have caused customers to contest bills

or lack the ability to pay them, while other customers fail to receive bills at all. Billing and measurement problems continue to this day. The City estimates that at least 10,000 of the 60,000 new meters are not functioning correctly, resulting in numerous unpaid accounts and water usage that is not accurately captured. The City's customers have lost faith in the water billing system as a result.

43.    The technical problems with the Siemens project were exacerbated by Siemens's hiring of—and failure to supervise appropriately—unqualified contractors. For example, neither U.S. Consolidated, nor M.A.C., nor Ivision was qualified to perform the work that Siemens purportedly hired the companies to perform. Siemens's use of unqualified subcontractors not only resulted in performance issues, but also inflated the costs of the project. With regard to the materials and work furnished by or through U.S. Consolidated, M.A.C., Ivision, and Garrett— under Siemens's negligent management and supervision—the work and materials were defective and contributed to the numerous technical problems with the Siemens water system that continue to this day.

44.    The Siemens project has devastated the City's finances. The City has fallen well short of its budgeted revenue target for water and sewer services since Siemens installed the new water system. It is estimated that the City is losing approximately $2 million in revenue each month, and the City has lost more than $20 million in revenue over the last year alone. Siemens, on the other hand, has been paid $90 million and continues to charge the City millions of dollars for Siemens to perform self-evaluations of its performance, even though such evaluations are primarily based on illusory guarantees that Siemens characterizes as "stipulated" savings.

## VI. CAUSES OF ACTION

### Count One – Fraud and Fraud in the Inducement

45.     Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

46.     During discussions before execution of the Agreement and in meetings and presentations seeking to obtain the City's approval of the water and sewer system project, Siemens and McNeil misrepresented to the City that:  (a) guaranteed savings and revenue from upgrading the City's water meter and billing system will pay for the cost of the $90 million water improvement project and the City's cost of financing the project; (b) due to the guaranteed savings and revenue from upgrading the City's water system there is no financial downside or financial risk for the City in hiring Siemens to install the new water meter and billing system; (c) Siemens will utilize and pay minority-owned businesses to perform 58% of the total $90 million contract price for the water system improvement project and such minority-owned businesses will perform a "commercially useful function," pursuant to the City's EBO plan, by being responsible for a distinct element of the work and actually performing, managing, and supervising the work involved; and (d) Siemens will mentor, train, and manage the minority-owned businesses involved in the project.

47.     The above referenced statements and misrepresentations were made by Siemens and McNeil with actual knowledge that they were false.  Alternatively, the above referenced statements and misrepresentations were made recklessly, as a positive assertion, and without knowledge of their truth.

48.     The above referenced statements and misrepresentations were material to the City's decision to enter into the Agreement and authorize Siemens to make improvements to the

City's water and sewer system. Siemens and McNeil made the above referenced statements and misrepresentations with the intention that the City act upon them and enter into the Agreement, and the City relied on the above referenced statements and misrepresentations in entering into the Agreement and authorizing Siemens to make improvements to the City's water and sewer system.

49.     As a result of Siemens's and McNeil's false representations, the City has incurred damages for which it now sues. The City requests that Siemens and McNeil be held jointly and severally liable and be ordered to disgorge all revenue and funds received from the City and pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the $90 million paid to Siemens in connection with the Agreement, and the City's lost revenue, debt service costs, loss of credit, damage to credit rating and reputation, investigation and remediation costs, and repair costs. The City also seeks punitive damages due to Siemens's and McNeil's fraud.

### Count Two – Negligent Misrepresentation

50.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

51.     Siemens and McNeil misrepresented to the City that upgrading the City's water meter and billing system will result in guaranteed savings and revenue that will cover the costs of the $90 million water improvement project and the City's cost of financing the project, and that due to Siemens's guarantee of savings and revenue there is no financial downside or risk for the City in hiring Siemens to install the new water meter and billing system.

52.     Siemens and McNeil failed to exercise reasonable care in making the above referenced statements and misrepresentations.

53.     The above referenced statements and misrepresentations were material to the City's decision to enter into the Agreement and authorize Siemens to install the water meter and billing system.  The City relied on the above referenced statements and misrepresentations in entering into the Agreement and authorizing Siemens to proceed with installing the water meter and billing system.

54.     As a result of Siemens's and McNeil's misrepresentations, the City has incurred damages for which it now sues.  The City requests that Siemens and McNeil be held jointly and severally liable and be ordered to pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the City's lost revenue, debt service costs, loss of credit, damage to credit rating and reputation, investigation and remediation costs, and repair costs.  The City also seeks punitive damages as Siemens's and McNeil's misrepresentations constitute gross negligence.

### Count Three – Civil Conspiracy

55.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

56.     Siemens and McNeil conspired with U.S. Consolidated, M.A.C., Ivision, and Garrett to accomplish unlawful purposes, including but not limited to the acts, omissions, and torts described in this Complaint, and to accomplish lawful purposes by unlawful means, including but not limited to the acts, omissions, and torts described in this Complaint.  The Defendants' conspiracy includes, but is not limited to, the fraudulent EBO pass-through scheme described in this Complaint.

57.     The Defendants had a meeting of the minds on the object or course of action, and at least one member of each conspiracy committed at least one unlawful, overt act to further the object or course of action.

58.     The City suffered injury as a proximate result of the Defendants' wrongful acts, including the fraud and other torts described in this Complaint.

59.     The City requests that the Defendants be held jointly and severally liable and be ordered to disgorge all revenue and funds received from the City and pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the $90 million paid to Siemens in connection with the Agreement, and the City's lost revenue, debt service costs, loss of credit, damage to credit rating and reputation, investigation and remediation costs, and repair costs.  The City also seeks punitive damages due to the Defendants' fraud, malice, and gross negligence.

### Count Four – Negligence

60.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

61.     Siemens owed legal duties to the City in connection with the design and installation of the water meter and billing system.  Siemens breached its duties and obligations to the City by failing to provide adequate design, services, management, and oversight, and by failing to furnish and install a water meter and billing system that was free of defects in design, work, and materials and that worked correctly with regard to both the physical equipment and software.

62.     Siemens breached its duties owed to the City by, among other reasons:  (a) failing to adequately design the water meter and billing system to ensure the proper installation of

equipment and the correct functioning of the equipment and software; (b) failing to adequately design the water meter and billing system to ensure that the system was appropriate for the City's resources and infrastructure and could be managed and operated by the City's personnel; (c) failing to responsibly and properly represent the City during installation of the water meter and billing system by using Siemens's professional skill and supervision; (d) failing to guard against defects and deficiencies in the work in a manner consistent with Siemens's standard of care; (e) failing to determine in general if the work, when fully completed, would be in accordance with applicable codes, regulations, and industry standards; (f) failing to use ordinary care, skill, and judgment in the installation of the water meters and billing system; (g) failing to use ordinary care, skill, and judgment in the selection of tradesman and subcontractors for installation of the water meters and billing system; and (h) failing to use ordinary care, skill, and judgment in inspecting the products and work for the water meter and billing project.

63.     U.S. Consolidated, M.A.C., Ivision, and Garrett owed legal duties to the City in connection with the materials and services they provided for the water meter and sewer system improvement project for the City, including the sale and installation of the new water meters, the implementation of the new water billing system, and the repairs to the City's sewer lines and water treatment plants.  U.S. Consolidated, M.A.C., Ivision, and Garrett breached their duties and obligations to the City by failing to provide adequate services and materials and by failing to furnish and install a water meter and billing system that was free of defects in design, work, and materials and that worked correctly with regard to both the physical equipment and software.

64.     The Defendants' breaches of their duties and standards of care proximately caused injury to the City, resulting in damages to the City, including but not limited to investigation and remediation costs, repair costs, loss of use, lost revenue, lost efficiency, loss of

credit, damage to credit rating and reputation, and other actual and consequential damages. The City also seeks punitive damages as the Defendants' conduct rises to the level of gross negligence.

### Count Five – Breach of Implied Warranty of Good Workmanship

65.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

66.     Siemens impliedly warranted that it was a careful and competent manager and contractor, and that it would provide construction services and project management in a good and workmanlike manner. Siemens did not provide such services in a good and workmanlike manner because the water meter and billing system installed by Siemens is inaccurate, flawed, and deficient.

67.     The City relied on Siemens's implied warranties. Siemens's breach of implied warranties directly and proximately caused injury to the City, resulting in damages to the City, including investigation and remediation costs, repair costs, loss of use, lost revenue, lost efficiency, and other actual and consequential damages.

### Count Six – Unjust Enrichment

68.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

69.     The Defendants have unjustly enriched themselves, to the City's detriment, by the acts, omissions, and torts described in this Complaint.

70.     The City paid Siemens more than $90 million for the installation of an automatic water meter system and online billing and payment system that is inaccurate, flawed, and otherwise deficient as described in this Complaint, and the project was awarded to Siemens

based on the Defendants' fraudulent misrepresentations. In addition, on information and belief, the other Defendants received millions of dollars for their participation in a fraudulent conspiracy with Siemens and for serving as pass-through, sham subcontractors on the Siemens project, which resulted in a water meter and billing system that is inaccurate, flawed, and otherwise defective as described in this Complaint.

71.    The Defendants' retention of the City's funds is unconscionable, and such funds belong to the City in equity and good conscience. The City requests that the Defendants be ordered to provide full restitution, disgorge all revenue and wrongfully-obtained funds, and pay all actual and consequential damages resulting from their wrongful conduct and retention of funds which in good conscience and equity belong to the City.

### Count Seven – Breach of Contract

72.    Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

73.    To the extent that the Agreement is enforced as written despite the fraud by Siemens as described in this Complaint, the City asserts in the alternative that the Agreement constitutes a valid, binding, and enforceable contract between Siemens and the City, and the City has performed its obligations under the Agreement.

74.    Siemens breached the Agreement by, among other reasons, failing to: (a) provide a fully-functioning and accurate Automatic Metering System; (b) provide the requisite training and administrative support to ensure a functional water metering and billing system; (c) properly install certain water meters; (d) ensure that customer billing account data was properly transferred and set up in the new billing system; (e) ensure increases in actual meter usage and increases in revenue that would exceed the cost of the water infrastructure improvement project

covered by the Agreement; and (f) ensure actual savings to the City from operational changes and deferred maintenance implemented as a result of the water infrastructure improvements covered by the Agreement.

75.    As a result of Siemens's breach of its contractual duties, the City has incurred money damages for which it now sues.

### Count Eight – Breach of Covenant of Good Faith and Fair Dealing

76.    Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

77.    To the extent the Agreement is enforced as written despite the fraud by Siemens as described in this Complaint, Siemens owed and continues to owe the City a duty of good faith and fair dealing in connection with the Agreement, which is implied in all contracts.   As described in this Complaint, Siemens breached such duty by failing to act consistently with the justified expectations of the City and by failing to act with decency, fairness, and reasonableness in its dealings with the City, including by charging the City more than $90 million for a water system upgrade that is deficient and for which Siemens cannot provide tangible performance guarantees, increased revenue, and cost savings to the City.

78.    As a result of Siemens's breach of its duty of good faith and fair dealing, the City has incurred money damages for which it now sues.  The City requests that Siemens be ordered to disgorge all profits and wrongfully-obtained funds, and pay all actual and consequential damages, resulting from Siemens's breach of its duty of good faith and fair dealing.  The City also requests punitive damages.

## VII.  AGENCY AND ALTER EGO LIABILITY

79.    Siemens Corporation and Siemens Industry, Inc. are wholly owned subsidiaries of Siemens AG.

80.    On information and belief, Siemens Corporation and Siemens Industry, Inc. are controlled by Siemens AG.  On information and belief, Siemens AG is the sole beneficiary and recipient of the revenue and profits generated by Siemens Corporation and Siemens Industry, Inc.

81.    Siemens Corporation executed a parent company guarantee with regard to the performance of Siemens Industry, Inc. in connection with the Agreement and the water system improvement project for the City.  To secure the Agreement and induce the City to approve the water system improvement project, Siemens represented itself as an $80 billion global company and provided the City with consolidated financial information for Siemens AG and all of its related entities and subsidiaries in representing that Siemens was the most qualified company to perform the water system improvement project for the City.

82.    Siemens Corporation and Siemens Industry, Inc. were the alter egos and mere instrumentalities of Siemens AG with regard to the water system project performed for the City and the negotiation and performance of the Agreement.  In addition, Siemens Corporation and Siemens Industry, Inc. were acting as the agents of Siemens AG in entering into and performing the Agreement and in all dealings with the City related to the water system improvement project, including representations to the City to induce the City to approve the project and enter into the Agreement.

83.    Under the circumstances, the separate corporate identity of Siemens AG should be disregarded and the corporate veil should be pierced to hold Siemens AG jointly and severally

liable with Siemens Corporation and Siemens Industry, Inc. for all conduct and damages alleged against Siemens in this Complaint.  With regard to all allegations against Siemens in this Complaint, Siemens AG, Siemens Corporation, and Siemens Industry, Inc. should be held jointly and severally liable and the separate corporate identities of the companies should be disregarded.

## VIII. DAMAGES

84.     At this time, the City seeks to recover more than $225 million in actual and consequential damages.  The damages sought by the City include more than $150 million for the City's costs of funding the fraudulent Siemens project, more than $75 million for lost revenue and for damage to the City's creditworthiness and reputation, and several million dollars for the estimated cost to repair and manage the malfunctioning water meter system.  The monetary damages sought by the City may increase as the City continues to investigate the scope of the City's injuries caused by the Defendants' conduct.

85.     The City also seeks punitive and exemplary damages due to the Defendants' fraud, malice, and gross negligence as set forth in this Complaint.

## IX. JURY DEMAND

86.     The City demands a trial by jury.

## X. PRAYER

The City prays that Defendants Siemens Industry, Inc., Siemens Corporation, Siemens AG, Chris McNeil, U.S. Consolidated, Inc., U.S. Consolidated Group LLC, M.A.C. & Associates, LLC, Ivision IT Consultants LLC, and Garrett Enterprises Consolidated, Inc., be cited to appear and answer herein, and that the City be awarded the following relief:

(a)     all actual and consequential damages resulting from Siemens's breach of contract and the Defendants' tortious conduct in an amount to be proved at trial, including but not limited to the costs incurred by the City in connection with the Agreement and the water meter and sewer system project, lost profits, lost revenue, debt

service costs, repair costs, loss of use, loss of credit and damage to credit reputation, business interruption losses, restitution of Defendants' wrongfully-obtained gains, and reimbursement for funds or property which in equity and good conscience belong to the City;

(b)    pre-judgment and post-judgment interest;

(c)    costs and attorney's fees;

(d)    punitive damages; and

(e)    such other and further relief, in equity or in law, to which the City may show itself justly entitled.

27

Respectfully submitted,

Winston J. Thompson, III
Mississippi Bar No. 100157
wjt3law@yahoo.com
Post Office Box 23579
Jackson, Mississippi 39225
Telephone:  (769) 233-7163
Facsimile:  (769) 233-7927

John M. Johnson (*seeking admission pro hac vice*)
Alabama Bar No. 7318o52
jjjohnson@lightfootlaw.com
Brandon K. Essig (*seeking admission pro hac vice*)
Alabama Bar No. 4186n51e
bessig@lightfootlaw.com
Zachary P. Martin (*seeking admission pro hac vice*)
Alabama Bar No. 3908d11o
zmartin@lightfootlaw.com
Lightfoot, Franklin & White LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone: (205) 581-0700
Facsimile: (205) 581-0799

Brian C. Boyle (*seeking admission pro hac vice*)
Texas Bar No. 24045543
bboyle@lightfootlaw.com
Charles M. Stam (*seeking admission pro hac vice*)
Texas Bar No. 24106462
cstam@lightfootlaw.com
Lightfoot, Franklin & White LLC
1885 Saint James Place, Suite 1150
Houston, Texas 77056
Telephone:  (713) 960-1488
Facsimile:  (713) 960-8991

ATTORNEYS FOR PLAINTIFF,
THE CITY OF JACKSON, MISSISSIPPI